UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------X
HASSAN MOHAMED ALI SALEM, *et al.*

               Plaintiffs,                    19 CV 0363 (SJ)

    v.

                                                  MEMORANDUM
                                                      AND ORDER

MICHAEL R. POMPEO, Secretary of State, *et al.*,

               Defendants.
----------------------------------------------------X


      Plaintiffs are United States ("U.S.") citizen children and U.S. citizen parents of children seeking U.S. passports and Consular Reports of Birth Abroad ("CRBA") at the U.S. Embassy in Djibouti ("Embassy Djibouti"). Plaintiffs move for a preliminary injunction against Secretary of State Michael Pompeo, Ambassador Larry Edward Andre Jr., Section Chief Devin Kennington, Consular Officer Chapman Godbey, Consular Officer Ryan Nolan, Embassy Djibouti, and the Department of State (collectively "The Government" or "Defendants") seeking, <u>inter</u> <u>alia</u>, to enjoin Embassy Djibouti from restricting the right to counsel in passport and CRBA interviews. The Government moves to dismiss Plaintiffs' complaint for lack of jurisdiction and failure to state a claim. Because of significant overlap of

1

issues, both motions are addressed here. Based on the reasons stated below, the parties' submissions, and arguments made on the record, the motion for a preliminary injunction is **DENIED** and the motion to dismiss is **GRANTED IN PART** and **DENIED IN PART**.

## I.  RELEVANT BACKGROUND[1]

The U.S. Embassy in Sana'a, Yemen ("Embassy Sana'a") suspended operations in February 2015 in response to escalating civil unrest and "the deteriorating security situation." Press Release, U.S. Department of State, Emergency Message for U.S. Citizens (Feb. 8, 2015), https://ye.usembassy.gov/emergency-message-u-s-citizens-february-8-2015/, (last visited Oct. 10, 2019). The State Department warned that, "U.S. citizens in Yemen remain vulnerable to kidnappings and terrorist attacks." (Id.) Once Embassy Sana'a suspended operations, Yemen-based U.S. citizens were required to apply for passports and CRBAs at other embassies in the region. All Plaintiffs in this case applied for their respective documents at the next closest U.S. Embassy, which is located in Djibouti across the Bab al-Mandab Strait on the African continent.

---

[1] Unless otherwise noted, all facts were drawn from the complaint (Dkt No. 1), the parties' additional submissions, and testimony before the court.

P-049

After Plaintiffs requested passport and CRBA interviews at Embassy Djibouti, a notice was posted in November 2018 (the "November Policy") on the Embassy website stating that attorneys were no longer permitted to attend interviews—a break from the typical procedure. Plaintiffs' interviews were scheduled but they chose not to attend in light of the November Policy. On January 17th, 2019, Plaintiffs brought suit in this Court and requested a preliminary injunction seeking <u>inter alia</u>, to enjoin Embassy Djibouti, "from denying U.S. citizens the right to legal representation during U.S. passport and/or CRBA interviews…" (Dkt. No. 1, ¶ 32.). On February 8, 2019, the day the Government filed its opposition to the preliminary injunction, the Embassy rescinded its notice and replaced it with a new notice permitting attorney presence but severely circumscribing their roles (the "February Policy"). Plaintiffs continue to seek a preliminary injunction enjoining the government from enforcing either the November or February policy.

### A. Passport and CRBA Procedures

At issue are the procedures in place for first-time passport applicants living abroad. (Docket Number ("Dkt. No.") 1, ¶ 56.) State Department Deputy Assistant Secretary Karin King provided an affidavit describing these procedures and the justifications for them. (Dkt. No. 30-1.) First-time passport applicants living abroad must appear at a U.S. embassy or consulate

3

and submit to an interview to "assess their credibility, verify their identity, and determine the reliability of the documents they submit by eliciting facts necessary to assess the citizenship claim." (Id. at ¶ 7.) "While all first-time applicants for a U.S. passport are required to appear in person by law (22 U.S.C. § 213) to submit their application and to take the requisite oath, a personal interview generally is not required domestically." (Id.) King stated that this is because, unlike international applicants, domestic applicants usually have "U.S.-issued identity and citizenship documents, which are presumptively valid absent fraud indicators." (Id.)

The State Department also issues CRBAs, a report documenting the birth of a citizen born abroad and serving as an official determination of the applicants U.S. citizenship. (Id. at ¶ 8-9.) CRBAs are issued when certain statutory requirements are met, including that one or both parents are U.S. citizens and that a U.S. citizen parent lived in the U.S. for a requisite amount of time prior to the birth. (Id. at ¶ 8.) Consular officers abroad are responsible for making these determinations through in-person interviews with applicants or parents of applicants. (Id. at ¶ 9.)

### B. U.S. Embassy Sana'a

The Plaintiffs allege that abuses from Embassy Sana'a, which closed down in 2015, have carried over to Embassy Djibouti under the supervision

4

of Consular Section Chief Kennington. (Dkt. No. 1, ¶ 23.) Plaintiffs allege that at Embassy Sana'a, United States citizens would routinely have their passports and CRBAs wrongfully confiscated without proper documentation and would be detained for hours without food, water, or their required medication. (Id. at ¶ 24-25.) Plaintiffs provide instances of illiterate and non-English speaking passport applicants that were provided forms that were in English that, in effect, were false confessions that renounced their right to citizenship. (Id. at ¶ 25-31.)

In October 2018, the Office of the Inspector General conducted a review of Embassy Sana'a after receiving a complaint (Dkt. No. 1, ¶ 25); U.S. Dep't of State Office of Inspector General, Review of Allegation of Improper Passport Seizures at Embassy Sana'a, Yemen (2018), https://www.oversight.gov/sites/default/files/oig-reports/ESP-19-01.pdf. The review found that in confiscating passports, "the Department did not follow relevant standards," and that "[t]he Department also failed to comply with relevant standards when it ultimately revoked the passports in all but one of the cases OIG examined." (Id.)

### C. U.S. Embassy Djibouti

In 2015, Embassy Djibouti began processing Yemini immigrant visa applications as well as passport and CRBA applications for children born in

5

Yemen to U.S. citizen parents. (Dkt. No. 30-1, ¶ 3.) Plaintiffs state that from March 2015 to April 2018, the two Consular Affairs Section Chiefs that served in that time were "dedicated to preserving the rights of U.S. citizen[s] and took great measures to ensure that laws were followed and U.S. citizens were protected." (Dkt. No. 1, ¶ 33.) However, Plaintiffs claim that under the new leadership of Section Chief Kennington, reports of verbal abuse, false accusations of wrongdoing, and denials of interpreters began to surface. (Id. at ¶ 38.) The degrading behavior described by Plaintiffs was alleged to have been perpetrated by Defendants Godbey and Nolan specifically and supported by affidavits by nonparties. (Id. at ¶ 39.)

Kennington took over as Section Chief in August 2018 and instituted a number of changes to "improve the efficiency and conduct of consular interviews." (Dkt. No. 30-1, ¶ 8.) For at least three years prior to his appointment, Kennington's predecessors accommodated attorney participation in passport and CRBA interviews. (Id. at ¶ 11.) However, on November 19, 2018, Kennington posted a notice on the Embassy website that stated, "attorneys are not permitted to [be] present during their clients' passport/CRBA interviews." (Id. at ¶ 12.) Kennington also confirmed this policy directly to Plaintiffs' attorney, Julie Goldberg, by email. (Id.) Kennington claims that attorney participation, "had often interfered with the

6

ability of consular officers to elicit the information they needed to adjudicate applications." (Id. at ¶ 11.) Kennington found this problematic due to the "prevalence of fraudulent citizenship and visa applications" attributed to the "unreliability of vital records documents from Yemen." (Id. at ¶ 3.) In response to this restriction of counsel, Plaintiffs chose to not attend their interviews and brought the instant action. Plaintiffs found the policy particularly concerning due to "numerous accounts from U.S. citizens and beneficiaries detailing racism and abuse from U.S. Embassy officials in Djibouti...since Defendant Devin Kennington...took over." (Dkt. No. 1, ¶ 54.)

As stated supra, Defendants reversed course and issued a new policy allowing attorneys to attend interviews, seemingly in response to this lawsuit. (See Dkt. No. 40-4.) However, per the February Policy, "[a]ttorneys may not engage in any form of legal argumentation before the consular officer," "object to or insist on the participation of an interpreter in the interview, to the qualification of any interpreter, or to the manner or substance of any translation," "object to a consular officer's question on any ground (including that the attorney regards the question to be inappropriate, irrelevant, or adversarial)," "summarize, correct, or attempt to clarify an applicant's response, or interrupt or interfere with an applicant's responses

7

to a consular officer's questions," or "instruct the applicant not to answer a consular officer's questions," among other restrictions. (Id.)

## II.    Procedural History and Preliminary Injunction Hearing

On February 12th, 2019, this Court held a hearing on Plaintiff's motion for preliminary injunction, where Plaintiffs had witnesses testify as to their experiences at Embassy Djibouti, including: Yousof Alrobye, Saddam Ali Alradai, Houssein Ahmed, and Sami Munassar.[2]

Yousof Alrobye ("Alrobye") is a nonparty U.S. citizen that went to Embassy Djibouti to interview for a visa for his wife and passports for his children. (Transcript of 2/12/19 Hearing ("Tr.") at 32.) Alrobye was a client of Attorney Goldberg at this time and attended the interview with her. At the interview, the consular officer "refused to take a look at" his application

---

[2] Plaintiffs also called Cordelia Gaupo. Gaupo was employed as an intern at the embassy in Djibouti. She was an Assistant in the visa section as well as the United States citizen services. While working at the embassy she witnessed CRBA interviews, passport application interviews, and visa interviews. However, the Government raised objections to her testimony as not being permitted by the State Department per Touhy and State Department regulations. See United States. ex rel. Touhy v. Ragen, 340 U.S. 462, 468 (1951) (holding that it was lawful for "a subordinate of the Department of Justice to [refuse] to submit papers to the court in response to its subpoena duces tecum on the ground that the subordinate is prohibited from making such submission by his superior…"); 22 C.F.R. § 172.9. Assuming arguendo that Touhy applied to an employee voluntarily testifying in Ms. Gaupo's situation, her testimony makes no difference to the outcome of the two instant motions. Cf. U.S. E.P.A. v. Gen. Elec. Co., 197 F.3d 592, 597 (2d Cir. 1999), opinion amended on reh'g, 212 F.3d 689 (2d Cir. 2000) ("Touhy merely dealt with the question of whether an employee, acting pursuant to the order of an agency decisionmaker could be held in contempt for failing to produce documents.").

P-049

materials, apparently believing Alrobye was engaged in passport fraud. (Tr. at 35.) Alrobye had an older passport previously confiscated by the State Department because it was damaged. He brought a copy of his old passport along with his new passport, that included a notation that his prior passport had been seized. (Tr. at 36-38.) Nevertheless, the officer found this suspicious and refused to consider his explanation and denied his application without full review. (Id.) Alrobye testified that the officer then stated that "all Yemini commit fraud." (Tr. at 44.) As a result of the denial, Mr. Alrobye's wife remained in Djibouti. (Tr. at 40.)

Sami Munassar ("Munassar") is a nonparty U.S. citizen who previously went to Embassy Djibouti to support his wife in her visa application. (Tr. at 53.) Munassar provided testimony consistent with the affidavit previously submitted in this case. (See Dkt. No. 25-1, Ex. G3.) Munassar testified that Defendant Officer Nolan was both rude to them in questioning the validity of their marriage and not proficient enough in Arabic to properly conduct his wife's interview. (Tr. at 55-57.) Nolan also questioned the authenticity of a certified copy of Munassar's Michigan birth certificate, before requesting to keep it. (Tr. at 58.) Munassar testified he did not want to give up the birth certificate but felt "nervous because the way [Nolan] treated [him] and talked down to [him]," so acquiesced. (Id.)

9

Ultimately, Officer Nolan denied the visa but it was later approved and Munassar's wife joined him in the U.S. (Tr. at 63-64.)

Saddam Ali Alradai ("Alradai") is a U.S. citizen plaintiff in this case. Alradai testified that his wife and five children fled Yemen and live in Djibouti awaiting U.S. Passports. He scheduled a passport interview in order to bring them to the U.S. (Tr. at 95.) He further testified about the difficult conditions his family faces in Djibouti, including: high costs of living, lack of healthcare, extreme heat, and infections transmitted by mosquitos that three of his children had developed. (Tr. at 97-99.) Alradai explained that despite these difficult conditions, he decided the family should not attend their passport interview without a lawyer following the November Policy because of his fear that they would be treated unfairly and have their applications denied without a lawyer present. (Tr. at 100.) His fear is predicated on information shared in the Yemeni community regarding embassy interviews and the experience of Alradai's brother—a U.S. citizen who did not have a lawyer and was unable to obtain visas or passports for his children to come to the U.S. for four years. (Tr. at 104.)

Houssein Ahmed ("Ahmed") is another U.S. citizen plaintiff in this case. He testified on direct that following the November Policy, he chose to set up and attend his son's passport interview without the presence of an

10

attorney and was approved without incident. (Tr. at 111-12.) He further testified that he would have preferred to have attended his appointment with his attorney but that the costs of financially supporting his family in Djibouti were so high, he was almost forced to sell his house and car to keep up the payments on their essential living costs. (Id.)

Plaintiffs seek a preliminary injunction to enjoin the Government from restricting their right to counsel during U.S. passport and CRBA interviews. Plaintiffs initially challenged the November Policy for barring attorney attendance altogether but maintain that the updated policy fails to remedy the denial of their right to counsel. The Government argues that the motion for preliminary injunction is procedurally improper because it seeks the equivalent of the final judgment on the merits. The Government also makes several procedural arguments in both its opposition to the preliminary injunction and its motion to dismiss. The Government argues that the November Policy is now moot since it has been superseded by the February Policy, which it further argues cannot be litigated because it is not ripe. The Government also argues that the plaintiffs lack standing and have failed to state a claim.

### III.    DISCUSSION

P-049

Before turning to the merits of the preliminary injunction, the Court must find it has jurisdiction. Am. Atheists, Inc. v. Port Auth. of N.Y. & N.J., 760 F.3d 227, 237 n.11 (2d Cir. 2014). Because the government raises substantially similar jurisdictional arguments in its preliminary injunction opposition and motion to dismiss, the Court will address them simultaneously.

**A. Standing**

"Whether a claimant has standing is the threshold question in every federal case, determining the power of the court to entertain the suit." Fair Hous. in Huntington Comm. Inc. v. Town of Huntington, 316 F.3d 357, 361 (2d Cir. 2003). "If plaintiffs lack Article III standing, a court has no subject matter jurisdiction to hear their claim." Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck–Medco Managed Care, L.L.C., 433 F.3d 181, 198 (2d Cir. 2005). To establish Article III standing, Plaintiffs must demonstrate they "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 578 U.S. 1540 (2016). An "injury in fact" is "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical."

<u>Lujan v. Defs. of Wildlife</u>, 504 U.S. 555, 560–61 (1992) (internal quotation marks, citations, and alterations omitted).

The Government argues that the Plaintiffs lack standing because there has been no concrete injury in that "[n]o plaintiff alleges that he attempted to appear for a passport or CRBA interview at Embassy Djibouti and was turned away because he wished to have counsel accompany him." (Dkt. No. 30, at 13.) The Government argues that "[a]ny challenges allegedly stemming from their delayed departure from Djibouti are of their own making since they chose not to appear at appointments they scheduled in December and January." (Dkt. No. 30, at 3.) Further, the Government argues that the restrictions on the right to counsel were "well within the legal authority and discretion of the State Department to manage Consular appointments of passports." (Tr. at 197.) The Government is resolute that at Passport and CRBA adjudications there is absolutely no right to counsel, statutory or otherwise. (Dkt. No. 40-1, at 2.)

The parties' dispute over the Plaintiffs' right to counsel largely turns on the extent to which 5 U.S.C. § 555(b) is applicable to the Embassy's passport and CRBA adjudications. The provision in dispute reads in relevant part: "A person compelled to appear in person before an agency or representative thereof is entitled to be accompanied, represented, and advised by counsel

13

or, if permitted by the agency, by other qualified representative…" 5 U.S.C. § 555(b). There is no dispute that a first-time passport applicant or parent of a CRBA applicant abroad "must appear at a US embassy or consulate." Dkt. No. 57; see also 22 U.S.C. 213 ("If the applicant has not previously been issued a United States passport, the application shall be duly verified by his oath before a person authorized and empowered by the Secretary of State to administer oaths."). Plaintiffs argue that "'must' is a compulsory word" and thereby this provision applies to them, a proposition the Government maintains "borders on the risible." (Dkt. No. 30, at 17.) The Court finds that this sentence is not applicable to Plaintiffs.

The government is correct that, "[c]ompelled" is a term of art connoting an obligatory, involuntary action, and its meaning for due process purposes is understood in the context of the Fifth Amendment's privilege against "compelled" self-incrimination." (Dkt. No. 40-1, at 18.); see F.C.C. v. Schreiber, 329 F.2d 517 (9th Cir. 1964) (holding "the word 'represented' must be read in light of the Due Process Clause of the Fifth Amendment…"). The legislative history also supports this reading. See S. COMM. ON THE JUDICIARY, 79th Cong., Note on Administrative Procedure Act (Comm. Print 1945) ("The first sentence is a recognition that, in the administrative process, the benefit of counsel shall be accorded as of right just recognized by the Bill of Rights

14

in connection with the judicial process, and as proposed by the Attorney General's Committee..."). Plaintiffs cite no case in which the term "compelled" in 555(b) is understood outside of the context of a summons or subpoena. Cf. Prof. Reactor Operator Soc'y v. NRC, 939 F.2d 1047 (D.C. Cir. 1991); SEC v. Csapo, 533 F.2d 7 (D.C. Cir. 1976); Great Lakes Screw Corp. v. NLRB, 409 F.2d 375 (7th Cir. 1969); Backer v. Comm'r of Int. Rev., 275 F.2d 141 (5th Cir. 1960). The Court is unwilling to impute Plaintiffs' sweeping definition to the word "compelled" without any indication that this was Congress' intent.

However, that is not fatal to Plaintiffs' claim. For purposes of conferring standing and stating a claim, this Court finds the second sentence in 555(b) dispositive: "A party is entitled to appear in person or by or with counsel or other duly qualified representative in an agency proceeding." 5 U.S.C. § 555(b). Given the broad definition of an "agency proceeding" under the Administrative Procedure Act, the Court finds that passport and CRBA interviews plainly qualify under this provision.[3] 5 U.S.C. § 551(12). The

---

[3] An "agency proceeding" is defined to include an "adjudication" or "licensing." 5 USC § 551 (13). An adjudication is the formulation of an "order," which "means the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing." 5 USC § 551 (6)-(7). "[L]icensing includes agency process respecting the grant, renewal, denial, revocation, suspension, annulment, withdrawal, limitation, amendment, modification, or conditioning of a license," which is defined to include, "the whole or a part of an agency permit, certificate,

Government has gone to great lengths to categorize passport and CRBA interviews as "highly informal window appointments" in order to argue that § 555(b) does not apply. (Dkt. No. 40-1, at 21.) Despite the informal procedures in question, the court finds that passport and CRBA interviews are agency adjudications, in that they issue "final disposition[s]...of an agency in a matter other than rule making but including licensing." 5 USC § 551(6). Further supporting this reading is the Government's own language in regulations, official policy, and representations in the instant action. See, e.g., 22 CFR § 50.5 ("upon application...a consular officer...may accept and adjudicate the application for a consular report of birth abroad of a citizen of the USA.") (emphasis added); Dkt. No. 40-4 ("Attendees may not interfere in any manner with the consular officer's ability to conduct all inquiries and fact-finding necessary to exercise his or her responsibilities to adjudicate the application.") (emphasis added); Dkt. No. 40-1, at Fn. 3 ("Meetings between passport/CRBA applicants...and the consular officers who adjudicate their applications...will be referred to interchangeably herein as CRBA and passport "appointments," "interviews," and "appointment interviews.") (emphasis added). Informality, in and of itself, is by no means an indication

---

approval, registration, charter, membership, statutory exemption or other form of permission." 5 USC § 551 (8)-(9).

P-049

that 5 USC § 555 does not apply, in fact the Supreme Court has indicated quite the opposite. See Pension Ben. Guar. Corp. v. LTV Corp., 496 US 633, 655 (1990) ("The determination in this case...was lawfully made by informal adjudication, the minimal requirements for which are set forth in the APA, 5 U.S.C. § 555...").

Further supporting this reading is the legislative history of the APA, which shows exact agreement between the House and Senate regarding the meaning of this sentence. Compare H.R. Rep. No. 1980, at 31-32 (1946) ("The word 'party' in the second sentence is to be understood as meaning any person showing the requisite interest in the matter, since the section applies in connection with the exercise of any agency authority whether or not formal proceedings are available.") (emphasis added), with S. Rep. No. 752, at 19 (1945) ("The word 'party' in the second sentence is to be understood as meaning any person showing the requisite interest in the matter, since the subsection applies in connection with the exercise of any agency authority whether or not formal proceedings are available.") (emphasis added).

With this understanding, Plaintiffs were entitled, at the very least, to have their attorney appear with them for their interviews. Depriving them of this statutory right amounted to an "actual" and "concrete" "invasion of a legally protected interest" directly caused by the Government's November

17

policy. Lujan, 504 U.S. at 560–61. Plaintiffs responded reasonably in refusing to attend scheduled interviews in which they would be denied a statutory right, especially considering the alleged mistreatment of Yemeni-born U.S. citizens at Embassy Sana'a and recent reports of misconduct at Embassy Djibouti. (See Dkt. No. 1, at ¶ 23-32, ¶ 36-39.) Therefore, Plaintiffs suffered an injury in that they are U.S. Citizens and children of U.S. Citizens who were denied the fair opportunity as required by the APA to apply for passports and proof of citizenship, effectively stranding them outside of the United States in an unfamiliar third country. Plaintiffs additionally allege injuries in the form of denied access to medical care,[4] lost wages, air travel, and room and board as a result of postponing their interviews. (Dkt. No. 1, at ¶ 23-24.)

The fact that no plaintiff appeared for their scheduled interview following the posting of the November Policy is of no import. Courts have established that futile gestures will not be required to meet the requirements of standing. See Jackson–Bey v. Hanslmaier, 115 F.3d 1091, 1096 (2d Cir.1997). Plaintiffs were not required to physically appear with counsel merely to test the clear language of an official Embassy Djibouti policy. See Williams v. Lambert, 46 F.3d 1275, 1280 (2d Cir. 1995) ("Such a gesture, however would

---

[4] Resulting in the contraction of infectious diseases for one plaintiff's children (Tr. at 97-99) and a miscarriage for another plaintiff's wife. (Tr. at 40.)

18

be a futile one, as her case would be dismissed summarily under the clear language of Section 516."); <u>Doe No. 1 v. Putnam Cty.</u>, 344 F. Supp. 3d 518, 534 (S.D.N.Y. 2018). Therefore, the Court finds that Plaintiffs, notwithstanding their decisions to skip their appointments, suffered a concrete and actual injury sufficient to confer standing.

However, the Government rightly points out that numerous plaintiffs have applied for and received their passports or CRBA documents since this suit was filed. (Dkt. No. 40-1, at 14.) Plaintiffs recently submitted a status report listing the following 31 Plaintiffs to which this applies:

> E.A.; H.A.; A.A. (1); A.A. (2); N.A.; Y.S. (3); F.S. (2); T.S.; S.M.; F.M.; H.M.; D.M.; A.S. (1); R.S. (1); A.S. (2); R.S. (2); F.S. (1) W.S.; Z.A.; F.A.; M.A.; NASER, Najiba Musleh Mohamed; KASSIM, Reda Mohamed; KASSIM, Redwan Mohamed; YAHYA, Ejlal; YAHYA, Ghadah; SAIDI, Mosad; SEIDI, Jameelah Musad; HASSAN, Ali; ALBULKHAITI, Aida Mansour; and H.S.

(Dkt. No. 64.) While these plaintiffs had standing at the outset of this case, the "case-or-controversy requirement subsists through all stages of federal judicial proceedings." <u>Lewis v. Cont'l Bank Corp.</u>, 494 U.S. 472 (1990). Today, these plaintiffs have no "personal stake in the outcome of the controversy...to justify the exercise of the court's remedial powers on [their] behalf." <u>Warth v. Seldin</u>, 422 U.S. 490, 498-99. While a favorable ruling to the remaining plaintiffs may ensure their statutory right to appear with counsel

19

is respected, there is no relief whatsoever that the Court could provide to these 31 plaintiffs now that they have their documents and are presumably in the United States or admissible thereto. As a result, the above listed 31 plaintiffs no longer have standing and they are dismissed as parties.[5]

## B. Mootness

The Government argues that this case is moot because it has ceased the allegedly illegal activity. However, "courts will find a case moot after a defendant voluntarily discontinues challenged conduct only if (1) it can be said with assurance that 'there is no reasonable expectation' that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." <u>Am. Freedom Def. Initiative v. Metro. Transp. Auth.</u>, 815 F.3d 105, 109 (2d Cir. 2016) (internal quotations omitted). "A defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is <u>absolutely clear</u> the allegedly wrongful behavior could not reasonably be expected to recur." <u>Mhany Management, Inc v. County of Nassau</u>, 819 F.3d 581 (2d Cir. 2016) (emphasis in original) (internal quotations and citations omitted).

---

[5] To the extent that any other plaintiffs receive their passports and/or CRBA documents, the government may file a motion attesting to that, to which Plaintiffs can respond.

Here, the Court finds the Government has not met its "formidable burden" of showing it is "absolutely clear" that it will not again bar attorneys from attendings passport or CRBA interviews. (Id.) While certainly true that when, "the defendant is a government entity, some deference must be accorded to...representations that certain conduct has been discontinued, some deference does not equal unquestioned acceptance." (Id.) (internal quotations marks and citations omitted). In a matter of months, the Embassy policy regarding attorney representation at passport and CRBA interviews changed twice. Prior to Defendant Kennington's tenure as Section Chief, attorney representation was permitted. Then, the November Policy wholly barred attorney presence at interviews (Dkt. No. 30-1, ¶ 18.) Then, the February Policy permitted limited attorney representation. Then, the February Policy was superseded by an April 17, 2019 notice, which applied the February Policy worldwide.

Here, like in Mhany, "suspicious timing and circumstances pervade the," Government's actions, which "appear to track the development of this litigation." Mhany, 819 F.3d at 604. Furthermore, the Government continues to insist that no right to counsel exists in these adjudications whatsoever because 5 U.S.C. § 555(b) does not apply. (See, e.g., Tr. at 22.) It can be inferred from these representations that the Government believes it has the legal

21

authority to reinstate the November Policy as it wishes. Further adding to the concern over the return to the November Policy is an affidavit by Attorney Mehgan Gallagher stating that she was barred from entering Embassy Djibouti to attend client interviews since the February Policy superseded the November Policy.[6] (Dkt. No. 57-1, Ex. B.) Given the rapid rescissions and adoptions of new policies, the curious timing of the February policy change, the Government's insistence on its legal authority to reinstate the November policy, and actual refusal of attorney attendance at interviews since the new policy went into effect, the Court is not convinced the same conduct will not occur and thus cannot apply the same deference to representations by the Government as would otherwise by typical.

---

[6] The Government moved to strike this affidavit for violating the advocate-witness rule. The court finds that the underlying premise of the advocate-witness rule is not applicable to this affidavit. The cases cited by the Government in support of this position concern attorneys testifying before juries at trials in which they were also the trying the case. See United States v. Alu, 246 F.2d 29, 33 (2d Cir. 1957); Ramey v. Dist. 141, Int'l Ass'n of Machinists & Aerospace Workers, 378 F.3d 269, 282-83 (2d Cir. 2004); United States v. Gasperini, No. 16-CR-441 (NGG), 2017 WL 3115706, at *3 (E.D.N.Y. July 20, 2017); United States v. Bin Laden, 91 F. Supp. 2d 600, 622-23 (S.D.N.Y. 2000). This is because the concerns that give rise to the advocate-witness rule are applicable only before a jury. See Murray v. Metropolitan Life Ins. Co., 583 F.3d 173, 178 (2d Cir. 2009). The Governments' motion to strike is denied as to Exhibits A and B. With regard to the remaining Exhibits, it is granted. Exhibit C is stricken as the decision in Omar v. Kerry, No. 15-1760-JSC (N.D. Cal. Feb. 16, 2016) was "vacated in full." Omar v. Pompeo, 2018 WL 4191416 (Aug. 16, 2018). Exhibit D is stricken as it appears to contain no relevant information. If Plaintiffs wish to properly submit the interrogation at a later date, they can attempt to do so. Exhibit E was deemed inadmissible at the February 12th hearing and Exhibits F and G are redundant as they were already submitted and accepted by this court as exhibits in Plaintiffs' Motion for Preliminary Injunction. (Dkt. 25-1 at Ex. G2, G6).

P-049

Furthermore, the "interim relief [offered by the new State Department policy has not] completely and irrevocably eradicated the effects of the [November Policy].". See Am. Freedom Def. Initiative, 815 F.3d at 109. While the February Policy does allow attorneys to attend their clients' interviews, it by no means restores the role of attorneys to Embassy Djibouti's pre-November modus operandi as Plaintiffs request. Currently, attorneys may not object or engage in any legal argumentation before the consular officer, they may not clarify, summarize, or respond to any of the consular's questions, the applicant cannot seek guidance from his/her attorney during the interview, attorneys may not bring interpreters for their own or their clients' understanding, amongst other restrictions. (See Dkt. No. 30-2.) These restrictions may ultimately be within the Government's authority, but the Court has yet to make that finding. For the foregoing reasons, the Court finds that the issue of the November policy is not moot and the issue of whether the February Policy has remedied the November restriction of counsel is ripe.

## C. The Preliminary Injunction

As an initial matter, the Government argues that the preliminary injunction is "procedurally improper because it seeks the equivalent of final judgment on the merits." (Dkt. No. 30 at 8.) Assuming the Government's contention that Plaintiffs are seeking the equivalent of final judgments is

true, this argument still fails. A preliminary injunction is "always appropriate to grant intermediate relief of the same character as that which may be granted finally." Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc., 527 U.S. 308, 326 (1999) (internal quotations omitted). The fact that "a plaintiff would get no additional relief if he prevailed at the trial on the merits should not deprive him of [injunctive relief.]" Tom Doherty Assocs., Inc. v. Saban Entm't, Inc., 60 F.3d 27, 34 (2d Cir. 1995) (internal quotations omitted). Therefore this argument is without merit.

Preliminary injunctions are appropriate "when the party seeking the injunction demonstrates (1) that he or she will suffer irreparable harm absent injunctive relief, and (2) either (a) that he or she is likely to succeed on the merits, or (b) that there are sufficiently serious questions going to the merits to make them a fair ground for litigation, and that the balance of hardships tips decidedly in favor of the moving party." Moore v. Consol. Edison Co. of New York, 409 F.3d 506, 510 (2d Cir. 2005) (internal quotation marks omitted). An injunction that changes the status quo and commands a positive act requires a "clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." Tom Doherty Assocs., 60 F.3d at 34. The parties

24

disagree as to whether this heightened standard applies, but as the motion fails under the lesser standard, the Court need not address this issue.

The crux of Plaintiffs' request is that that they seek to enjoin Embassy Djibouti from restricting the right to counsel in any way inconsistent with the practice at Embassy Djibouti prior to the November Policy. To succeed on their motion for a preliminary injunction, they must first show that absent the injunction, they will suffer irreparable harm. <u>Bell & Howell Mamiya Co. v. Masel Supply Co.,</u> 719 F.2d 42, 45 (2d Cir. 1983). Plaintiffs fail to do so.

The harm suffered "must be so imminent as to be irreparable if a court waits until the end of trial to resolve the harm." <u>Rodriguez ex rel. Rodriguez v. DeBuono,</u> 175 F.3d 227, 235 (2d Cir. 1999). It must be a "continuing harm which cannot be adequately redressed by final relief on the merits" and for which "money damages cannot provide adequate compensation." <u>Kamerling v. Massanari,</u> 295 F.3d 206, 214 (2d Cir. 2002) (internal quotations omitted). Plaintiffs allege a risk of future psychological harm stemming from verbal abuse by Consular Officers as well as monetary, educational, and health harms stemming from being denied U.S. passports and CRBAs while they remain in Djibouti without proper domiciles, family

ties, or sense of security.[7] (Dkt. No. 31, at 18-20.) These alleged harms are speculative and furthermore, the requested preliminary injunction is not likely to prevent them.

Most importantly, attorneys are no longer barred from attending their clients' CRBA or Passport interviews pursuant to the current State Department policy. As Plaintiffs' counsel has suggested, extreme mistreatment by Consular Officers is far less likely to occur in the presence of an attorney. (Dkt. No. 31 at 22.) Additionally, Consular Officer Godbey, who is alleged to have committed the bulk of misconduct, is no longer stationed at Embassy Djibouti. (Dkt. No. 40-1 at 20-21.)

The Government has taken other corrective action which reduces the likelihood that Plaintiffs will experience the alleged harms during and as a result of passport and CRBA interviews. Since the February Policy went into effect, at least 30 plaintiffs in this case have had passport or CRBA interviews.

---

[7] Plaintiffs also allege they are at imminent risk of being "trapped [in] a room, interrogated for hours, deprived [of] food and water," absent their requested injunction. (Dkt. No. ¶ 31 at 20.) Plaintiffs suggest that this conduct, previously documented in Embassy Sana'a prior to 2015, is at imminent risk of repetition, "given the annexed accounts of mistreatment by U.S. Embassy officials in Djibouti since Defendant Kennington recently assumed leadership." (Id.) This logical leap by Plaintiffs is, by definition, speculative. No doubt, the conduct of certain Embassy Djibouti officials alleged by Plaintiffs is unprofessional and in some instances reprehensible. However, it does not demonstrate that Plaintiffs are at imminent risk of custodial interrogation against their will and the denial of basic sustenance.

(Dkt. No. 54 at 5.) It appears there were no instances of misconduct or verbal abuse in any of these interviews, and only one person was denied the documents they sought for a seemingly legitimate reason. (Dkt. No. 54-13.) Further underlining this point, Deputy Assistant Secretary King noted that "even if a passport or CRBA application is denied or a consular officer terminates the interview, it is without prejudice to the applicant applying again thereafter." (Dkt. No. 30-1, ¶ 31.) Just as the government modified the policy during the pendency of this action, it also shifted staff, installing a new consular officer whose comportment does not trouble Plaintiffs. (Dkt. No. 54 at 22.) Plaintiffs' counsel suggests that this officer was brought in to give "very special treatment" to these plaintiffs and "make sure [her] cases went away." (Dkt. No. 54 at 22-23.) Whatever the merits of this allegation, the fact remains for the purposes of issuing a preliminary injunction, Plaintiffs have not met their burden because the likelihood of irreparable harm to Plaintiffs absent the requested injunction appears to be minimal.

### D. Failure to State a Claim

The Government has moved to dismiss Plaintiffs' complaint for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." Bell Atl.

Corp. v. Twombly, 550 U.S. 544, 570 (2007). In ruling on this motion, this Court, "must accept as true all of the factual allegations contained in the complaint." (Id. at 572)

i.     **Count One: *Bivens***

While Plaintiffs' Prayers for Relief do not contain a specific claim for monetary damages, they bring Count One against Defendants Kennington and Godbey pursuant to Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971). Even assuming Plaintiffs' denial of counsel amounted to a constitutional violation, the Bivens claim is dismissed. The Supreme Court recently, "set out a rigorous two-step inquiry for courts to determine whether to imply a Bivens cause of action." Sanford v. Bruno, 2018 WL 2198759, at *5 (E.D.N.Y. 2018) (citing Ziglar v. Abbasi, 137 S. Ct. 1843 (2017)). First, "the court must determine whether a plaintiff's claims arise in a new Bivens context." (Id.) If so, "the court asks 'whether any alternative, existing process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages.'" (Id.) (quoting Wilkie v. Robbins, 551 U.S. 537, 550 (2007). In setting this new standard, the Supreme Court stated that "expanding the Bivens remedy is now a disfavored judicial activity." Abbasi, 137 S. Ct. at 1857.

28

The facts of this case bear no resemblance to previously recognized Bivens claims. See Bivens, 403 U.S. 388 (finding an implied cause of action based on the Fourth Amendment for damages to compensate an injury stemming from a search and seizure injury); Davis v. Passman, 442 U.S. 228 (1979) (finding an implied cause of action based on the Fifth Amendment Due Process Clause for damages as a result of gender discrimination); Carlson v. Green, 446 U.S. 14 (1980) (finding an implied cause of action based on the Eighth Amendment for damages as a result of failing to treat a prisoner's asthma). In the present case, the alleged constitutional violation is a denial of the right to counsel in passport and CRBA interviews based on Embassy Djibouti's official policy, and not the rogue unlawful actions of individual actors. As evidenced by the instant action, Plaintiffs are able to adequately protect this interest by seeking injunctive relief outside of the Bivens context. Therefore, this court will not create "a new and freestanding remedy in damages." Robbins, 551 U.S. at 550. Even accepting all factual allegations in the Complaint as true, Plaintiffs have failed to state a cognizable Bivens claim, and it is dismissed.

ii.    **Count Two: Violation of Plaintiffs' Statutory Right to Counsel**

The Government largely bases its motion to dismiss on its position that, "there is no constitutional or statutory right to counsel at [passport or CRBA

interviews]." (Dkt. No. 40-1 at 17.) As explained supra, Section III(A), altogether barring attorney presence at passport and CRBA interviews was a violation of Plaintiffs' statutory right to, "appear…by or with counsel…in an agency proceeding." 5 U.S.C. § 555(b). Therefore, the Government's motion to dismiss is denied as to Count Two. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

### iii. Count Three: Violation of Plaintiffs' Fifth Amendment Due Process Right to Counsel

Plaintiffs further claim that the November Policy violated a right to counsel rooted in the Fifth Amendment's Due Process Clause. (Dkt. No. 1, ¶¶ 78-110.) "Procedural due process imposes constraints on governmental decisions which deprive individuals of "liberty" or "property" interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." Mathews v. Eldridge, 424 U.S. 319 (1976). "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." Morrissey v. Brewer, 408 U.S. 471, 481 (1972). In determining what due process requires the court considers:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function

30

> involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Mathews, 424 U.S. at 335. At this early stage, the Court need only decide whether, accepting all factual allegations as true, the November policy violated Plaintiffs' rights to due process.

The Government argues that this claim should be dismissed because the Supreme Court "held long ago...that there is no constitutional right to counsel in non-adjudicatory fact-finding inquiry conducted by a federal agency." (Dkt. No. 40-1 at 17.) (citing Hannah v. Larche, 363 U.S. 420, 442-43, 446 (1960); In re Groban, 352 U.S. 330, 332 (1957).). Because passport and CRBA interviews are agency adjudications and not merely fact-finding inquiries, these authorities are not controlling. While generally informal, passport and CRBA interviews abroad are adjudications with vast implications on individual liberty interests and thereby require due process. Kent v. Dulles, 357 U.S. 116, 125 (1958) ("The right to travel is a part of the 'liberty' of which the citizen cannot be deprived without the due process of law under the Fifth Amendment.").

Nor is Wasson v. Trowbridge controlling. 382 F.2d 807 (2d Cir. 1967). In that case, the Second Circuit ruled that counsel was not a required in a Marine cadet expulsion hearing as an "ingredient of fairness" because "other

31

aspects of the hearing taken as a whole [were] fair." (Id. at 812). The court placed great significance on the fact that, "the military has been permitted greater freedom to fashion its disciplinary procedures than the civilian authorities," and considered the fact that the plaintiff was "mature and educated" as an ingredient of fairness. (Id.) Applicants applying for passports and/or CRBAs abroad, on the other hand, are often illiterate and unable to speak to English. (Dkt. No. 1 at ¶ 25.) In addition, the private interest at stake is considerably greater in passport and CRBA interviews abroad.

The private interest of Plaintiffs in the correct outcome of passport and CRBA interviews cannot be overstated—contrary to the Government's repeated characterizations, this is not akin to an appointment at the DMV. Wrongfully withholding a passport from a U.S. citizen <u>domestically</u> is a grave deprivation of constitutional rights. See <u>Kent</u>, 357 U.S. 116, 129 ("the right of exit is a personal right included within the word 'liberty' as used in the Fifth Amendment."). Denying a passport to a U.S. citizen <u>abroad</u> is far more serious as it strands the individual outside the country and effectively deprives them of their most basic "right to have rights." <u>Trop v. Dulles</u>, 356 U.S. 86 (1958). Doing so is tantamount to denationalization, a punishment that the Supreme Court has ruled "more primitive than torture." <u>Trop</u>, 356

32

U.S. at 101. Therefore, it is paramount that passport and CRBA interviews be performed in a way that minimizes the risk of erroneous adjudications.

Without deciding the full constitutional requirements of passport and CRBA interviews, the Court finds that the Governments' policy barring attorneys entirely from attending passport and CRBA interviews violates due process. While allowing the mere presence of retained counsel at these interviews creates only a minimal administrative burden on the Government, their presence offers an important safeguard against potential abuses of governmental power and procedural errors. While this Court recognizes that most State Department employees carry out their duties with professionalism and due regard for the rights of U.S. citizens, documented misconduct at Embassy Sana'a and the instant action clearly demonstrate the need for such a safeguard.

Therefore, the Court finds that the Government's Motion to Dismiss is denied as to Count Three.

### iv.     Counts Four through Six: the remaining Constitutional claims

The remaining constitutional right to counsel claims have been considered by this Court and are without merit. Plaintiffs' theories of a right to counsel at passport and CRBA interviews based in Substantive Due Process, Equal Protection, and the Ninth Amendment are without precedent,

33

lack a cogent legal theory, and in some instances lack any legal citation whatsoever. The harm Plaintiffs allege stem not from the denial of passports or CRBAs, as no Plaintiff alleged such harms, but rather the process in which they seek these documents. For those reasons, the Fifth Amendment's Due Process Clause is the only proper Constitutional claim raised by Plaintiffs. As such, Counts Four through Six are dismissed.

### IV. Conclusion

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction is denied and the government's motion to dismiss is denied as to Counts Two and Three and granted as to Counts One, and Four through Six.


**SO ORDERED.**


Dated: January 8, 2020
Brooklyn, NY

/s

Sterling Johnson, Jr., U.S.D.J.

P-049